## No. 16,138.

O'BYRNE, INTERVENER *v.* SCOFIELD, INTERVENER
(212 P. [2d] 867)

Decided November 7, 1949.

Mr. BENJAMIN E. SWEET, Mr. JOHN S. POYEN, for plaintiff in error.

Mr. Ivor Wingren, for defendant in error.

*En Banc.*

Mr. Justice Stone delivered the opinion of the court.

On February 10, 1927, O'Byrne contracted with one McNeill to act as his attorney in proceedings to enforce a lien on certain mining property, on which O'Byrne also claimed a lien, for a fee of one-third the recovery and with right to employ other counsel to assist him. A few weeks later, O'Byrne engaged Scofield to assist him in prosecuting this claim, and by instrument in writing, assigned to Scofield a one-half interest in his fee contract with McNeill, "including any and all rights of action which may accrue thereunder, together with all other rights of whatever nature or kind under said contract in connection therewith or in the making thereof."

O'Byrne and Scofield under such employment by McNeill obtained judgment in his favor, made levy thereunder on the mining property and obtained sheriff's deed thereto conveying a fractional interest to O'Byrne and the remaining interest to McNeill. The respective interests were finally determined in the case of *O'Byrne v. McNeill*, 90 Colo. 226, 7 P. (2d) 956, decided on February 1, 1932. O'Byrne paid all taxes on the interest held in his name and the costs of subsequent litigation with reference to the property. It does not appear that any income was received. On May 29, 1936, O'Byrne contracted for the sale of this interest for $80,000.00. This contract was made with the full knowledge of Scofield, who assisted in making collections thereunder. A total of $32,000.00 was paid on the purchase price between the date of the contract and July 21, 1937. Many of the payments were sent to Scofield who turned them over to O'Byrne, who, in turn, out of these payments, gave Scofield various sums totaling $6,500.00,

which were paid and received as attorney fees for his services in connection with the property, except one payment as hereafter appears. Thereafter the contract purchasers made no further payments and the contract was forfeited.

Scofield made no demand on O'Byrne for payment from 1937, when the last payment as of fees was made, until about January, 1945. The relations between O'Byrne and Scofield continued friendly, and there was no apparent dispute of any sort between them. One of the payments made by O'Byrne to Scofield in February, 1937, was in the sum of $1,250.00, and late in 1944 O'Byrne made claim that this payment was made as a loan to Scofield rather than as a payment on account of fees, and asked for its return. Scofield denied that it was a loan and refused to repay it or any part of it. After some controversy, Scofield wrote O'Byrne on January 29, 1945, referring to the payment and saying, inter alia: "For many long years, I represented you as counsel without any agreement as to what my compensation would be, with a full knowledge that I would receive nothing unless you obtained title to the mining property that you now own and were able to liquidate it for cash. You finally did liquidate it and for a time paid me as the payments came in, a reasonable portion of the amount received by you. You finally tapered off and failed to make any payments. In as much as you now desire to enter into a controversy with me, I demand the balance of my fee which I believe to be at this time $1500.00, after giving you credit for the $1250.00 which you have mentioned to me."

Scofield testified that during all these years he had forgotten the assignment which had been made to him of a half interest in the property and had no recollection of it until he discovered the instrument of assignment some time later. Then, on August 23, 1945, he again wrote O'Byrne, reciting the employment and the property interest acquired thereby and requesting an ac-

counting of receipts and expenditures together with a conveyance of his interest in the property. Apparently this letter, as well as that of the preceding January, was ignored.

In the meantime, in 1942, McNeill had brought suit against Carlson and others for conversion of certain personalty belonging to him and located on this mining property of which McNeill and O'Byrne were tenants in common of record by virtue of the sheriff's deed above mentioned, and also, in a second cause of action, for damages to the real estate by forcibly entering thereon. In that action McNeill obtained judgment for $7,500.00 on his second cause of action in August, 1943. Thereafter, subsequent to the affirmance of that judgment by this court, in *Carlson v. McNeill*, 114 Colo. 78, 162 P. (2d) 226, and on July 23, 1946, O'Byrne, appearing by counsel other than Scofield, filed a petition in intervention in said action whereunder O'Byrne was awarded an undivided fractional interest in McNeill's judgment on his second cause of action. Writ of execution was then issued and garnishee summons served thereunder against Esther J. Carlson, et al. On November 30, 1946, Scofield filed claim in intervention in that action, setting up his claim to a one-half interest in the fractional interest in the mining property which had been acquired in the name of O'Byrne as fees for services in the McNeill litigation, and praying that he be awarded his proper fractional interest in the proceeds obtained by any writ of garnishment under the judgment in the second cause of action brought by McNeill.

By answer O'Byrne raised several issues and upon trial thereof the court found in favor of Scofield, holding the assignment valid and adjudging him to be entitled to a share in any recovery under the writ of garnishment as prayed, and awarding him judgment against O'Byrne for a share of the $32,000.00 received by O'Byrne under the contract for sale of the mining property, less the sum of $6,500.00 already paid to him

and less Scofield's proportionate share of taxes and costs of litigation with interest, which O'Byrne paid out.

Reversal is here sought on the following grounds: (1) That the petition failed to state a claim upon which relief could be granted; (2) that the contract between O'Byrne and Scofield was void, because between attorney and client; (3) the statute of limitations; (4) estoppel, and (5) laches.

■ ■ 1. The petition in intervention contained a short and plain statement of the claim. It indicated the type of litigation, gave a generalized summary and afforded fair notice of the issue tendered. That is all that is required. *Berryman v. Berryman*, 115 Colo. 281, 172 P. (2d) 446. Under our procedure, estoppel, laches and the statute of limitations if relied on must be affirmatively set forth in the answer and need not be negatived by detailed recital of exculpatory facts in the complaint. Moreover, the record shows no motion to dismiss for failure to state a claim or challenge made thereto prior to trial, wherefore we are concerned, not with the formal pleadings, but with the issues actually presented and determined.

■ 2. Although sometimes so appearing on the records, O'Byrne and Scofield were not in fact attorney and client, but were associates working together, first as attorneys representing the same client and later as co-owners protecting their common property interest. Moreover, contracts between attorney and client are not void, as contended by counsel, but voidable, and there is nothing either in the pleadings or proof to suggest that O'Byrne sought to avoid the contract on that ground.

■ 3. Counsel asserts that the statute of limitations began to run upon issuance of the sheriff's deed and barred the claim, but cites no authorities in support of this assertion. When O'Byrne took title to the property interest acquired by the joint efforts of the two men in his own name, he took it subject to his agreement to assign and convey to Scofield a one-half interest therein,

and there was created a resulting trust as to such one-half interest. There is no element of fraud or bad faith involved. The title is presumed to have been so taken by mutual consent and there is no suggestion in the record to the contrary. Such holding does not give rise to a cause of action in favor of the cestui until demand on his part or denial of the trust on the part of the trustee. Bogert, Trusts and Trustee, Vol. 4, Part 2, page 209, §952; Perry on Trusts and Trustees (7th ed.), vol. II, page 1478, §865. There was here no denial of the trust until after Scofield's letter of August, 1945, and the statute had not barred the claim.

■ 4. The next ground urged is estoppel. The argument is based on the silence of Scofield when, it is said, he was duty bound to assert his interest as separate from that of O'Byrne in the litigation concerning the property. Since the title was in the name of O'Byrne and the question of beneficial ownership was not a matter of concern in the several suits, there appears to be no reason why Scofield's interest should have been injected therein. O'Byrne admittedly was aware of the assignment at all times and there is no evidence that he changed his position or was in any way prejudiced by failure of Scofield to assert his interest or even by his letter, written a few months before he discovered the assignment, demanding the balance of fees he then considered due. There is no contention that O'Byrne paid the fee demanded in the letter or any part of it and there is no evidence that as a result of the silence or oversight of Scofield he was in any way misled to his disadvantage. "Estoppel can arise only where the one relying thereon has changed his position to his material detriment because of the conduct of the other party." *Thomas, Conservator v. First Nat. Bank*, 97 Colo. 474, 478, 51 P. (2d) 589. True, O'Byrne paid the taxes on the interest of both, but such payment was voluntary, and he made no request of Scofield for his share.

■ 5. The last ground urged is laches. We have al-

ready discussed the defense of the statute of limitations. Ordinarily, where the law provides a statute of limitations, it will be followed in equity. "The statute fixes a limitation beyond which the courts cannot extend the time, but within this limit the peculiar doctrine of courts of equity should prevail." *Great West Min. Co. v. Woodmas of Alston Min. Co.*, 14 Colo. 90, 23 Pac. 908. The basis of laches in equity is unreasonable delay and lack of diligence extending for so long a time or under such circumstances that it would be inequitable to grant relief. Particularly is this true where witnesses have died or their memories become dim or time and long acquiescence have obscured the nature and character of the trust or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance. *Kleinclaus v. Dutard*, 147 Calif. 245, 81 Pac. 516.

In the case before us the agreement under which Scofield assisted O'Byrne in the litigation for a contingent fee was executed March 15, 1927. Thereafter they proceeded with their services to the common client McNeill, with the result that the lien was established and the decree signed on August 29, 1927, but due to dispute with their client the matter was carried to this court where it was not finally decided until February 1, 1932. *O'Byrne v. McNeill*, 90 Colo. 226, 7 P. (2d) 956. In the meantime there were various suits involving outstanding tax certificates and hearings before the county commissioners and suits against neighboring leaseholders for damage and injunction, participated in apparently both by O'Byrne and Scofield until the contract of sale in 1936. Following this contract, Scofield handled the correspondence and the collections over a period of more than a year. He turned all receipts over to O'Byrne, in whom he had full confidence, as appears both from his express testimony and the long period of years in which he handled litigations with him without accounting, and accepted without question the portion of fees which O'Byrne paid him. Inasmuch as O'Byrne

had advanced taxes and other expenses, Scofield was not entitled to his full fractional share of the proceeds. After the forfeiture of the sales contract there was apparently other litigation; the property produced no income, and was subject to no expense except taxation and expense of litigation. During virtually the entire period of the trust, Scofield as well as O'Byrne was actively engaged in conserving their common property. After receipt of the $32,000.00 under the sales contract, O'Byrne held more than sufficient money in excess of his share of the proceeds to repay all amounts which he had advanced, or paid out thereafter, for taxes and other expenses, and we find no loss or prejudice to O'Byrne by reason of Scofield's delay.

*Warren v. Adams,* 19 Colo. 515, 36 Pac. 604, not mentioned in the briefs, is pertinent to several of the questions here raised. In 1890 Warren sued the heirs of John W. Iliff, reciting that in 1866 he had brought a large herd of cattle to Denver and employed Iliff as his agent to assist him in selling, and through him sold, 100 head; that the purchaser had no means of payment except by conveyance of a tract of land which was accepted as payment; that the land was deeded to Iliff, who agreed to sell it for plaintiff; that plaintiff was ill and lost memory of the transaction until it was called to his attention in 1888. Our court held that this created a resulting trust and said: "While the statute of limitations does run against a resulting trust, or, more property speaking, a constructive trust which is initiated by and is originated through the wrongful conduct of the trustee, from the date of its inception, it does not apply to that class of resulting trusts that are created with the consent of the trustee and cestui que trust. In the latter class no right of action accrues until the trust is repudiated, or in some manner disavowed by the trustee, and the knowledge of such repudiation or disavowal brought home to the knowledge of the cestui que trust." It there was contended that the payment of taxes and the re-

demption of a portion of the land from the tax sale by Iliff in his own name constituted a repudiation of the trust, but this contention was overruled by the court which held that, although not expressly obligated to pay the taxes, his voluntary payment thereof would be presumed to have been made to preserve the trust estate, rather than with the intent and purpose of defrauding his cestui que trust; that, being consistent with his duty as trustee, it did not constitute such a hostile holding or claim on his part as would evidence a repudiation of his trust. The question of laches also was raised in that case, and the court held that, to constitute a stale equity, "The circumstances under which the delay occurred, together with the lapse of time, must be such as to impute negligence to the party who seeks relief." It also noted, as equitable considerations, that no rights of third parties had intervened; that the land had remained open and unoccupied, with no expenditure and improvements made thereon, and that the delay had not operated to the prejudice of the trustee.

The judgment of the trial court is affirmed.

MR. JUSTICE MOORE and MR. JUSTICE HOLLAND not participating.